In re ARBUCKLE MASTER CONSERV-
ANCY DISTRICT, DISTRICT COURT,
MURRAY COUNTY, NO. 9660.

ARBUCKLE MASTER CONSERVANCY
DISTRICT, Plaintiff in Error,

v.

G. Don PETITTI, Gene Cope, William G.
Gaskins, E. Dunlap, Jr., Bob Downing,
John H. Frazier, Jack O. Conroy, The City
of Ardmore, Oklahoma, a Municipal Cor-
poration, The City of Davis, Oklahoma, a
Municipal Corporation, and The Southern
Oklahoma Development Association, a Vol-
untary Association, Defendants in Error.

No. 43497.

Supreme Court of Oklahoma.

June 23, 1970.

As Amended and Rehearing Denied
July 21, 1970.

Frank Gibbard, Sulphur, Russell G. Jones, Lawton, for plaintiff in error.

Gene T. Ritter, Ardmore, for City of Davis, Okl.

Millard F. Lowrance, Sulphur, for City of Sulphur, Okl.

R. B. Garvin, Richard B. McClain, Pauls Valley, for City of Wynnewood, Okl.

G. T. Blankenship, Atty. Gen., Duane Lobaugh, Asst. Atty. Gen., for intervening plaintiff in error.

James E. Thompson, for defendants in error, the individual petitioners.

Andrew B. Riddle, Jr., City Atty., for City of Ardmore, Okl.

Fischl, Culp & McMillin, Ardmore, for Southern Oklahoma Development Assn.

BERRY, Vice Chief Justice.

Complete recitation of factual background would be unduly extended by reason of multiplicity of parties, variant interests and machinations involved. Risking oversimplification, we summarize acts and matters relating to parties who initiated acts, or participated in transactions, which resulted in creation of Lake of the Arbuckles project, and provoked issues herein presented.

Residents of Murray County, and other southern counties, formed Southern Oklahoma Development Association in 1955 to promote Lake of the Arbuckles water project. Planning culminated in meetings at Federal level, which generated agreement by Bureau of Reclamation, hereafter the Bureau, to institute feasibility study. May 14, 1957, the Federal government advised the Oklahoma Water Resources Board of intention to utilize unappropriated

waters of Rock Creek, and requested same be withdrawn from further appropriation. On June 7, 1957, the Board formally withdrew this water from appropriation in conformity with 82 O.S.1951, § 91. On March 26, 1958, the United States, through the Bureau contracted for feasibility study in consideration of Southern Oklahoma Development Association's agreement to pay $10,000.00 costs of this survey.

■ Southern Oklahoma Development Association no longer operates independently, but within the Interlocal Cooperation Act, 74 O.S.Supp.1967 § 1001 et seq., which affects a 10 county area, various municipalities and soil conservation districts. The trial court properly determined Southern Oklahoma Development Association was not entitled to affirmative relief, because neither a taxpayer nor contracting water user.

May 10, 1960, the United States forwarded Oklahoma Water Resources Board a Plan Of Development For Arbuckle Project, and requested filing in compliance with statutory authority (82 O.S.1951, § 91) under which water of Rock Creek previously had been withdrawn from appropriation. This plan, submitted as inducement for congressional authorization of the project, provided:

"The plan of development contemplates, as a Federal project, (1) the construction of Arbuckle dam, reservoir, and related recreational facilities, (2) the construction of pipelines and pumping facilities necessary to deliver water from the reservoir to Ardmore, Ardmore Airfield, Sulphur, Davis, Wynnewood, and the Kerr-McGee Refinery, and (3) the purchase and development of wildlife management program lands to mitigate upland game losses caused by reservoir construction."

This development plan also was basis for a committee report to Congress recommending passage of enabling legislation for the project. In every instance the plan expressed furnishing of needed water to area municipalities, including City of Ardmore. By Congressional Act (August 24, 1962) Public Law 87–594, 43 U.S.C. §§ 616k–616s inclusive, construction of the Arbuckle project was authorized.

Petition for creation of the District had been filed January 24, 1962, and referred to district court of Murray County for hearing and determination in conformity with 82 O.S.1961, § 542. Decree creating Arbuckle Master Conservancy District, hereafter Arbuckle, was entered April 24, 1962, declaring the purpose and fixing district boundaries as follows:

"* * * developing and providing water for domestic, industrial and agricultural requirements, and to persons within the territory of the District;

* * * * * *

"To enable the acquisition, construction and maintenance of improvements and facilities for common benefit and/or use of constituent areas; * * *."

The decree also fixed boundaries for Arbuckle until specifically defined by viewers and engineers, as "* * * boundaries or city limits of Wynnewood, Davis, Sulphur, Dougherty, Ardmore (including Ardmore Industrial Airpark), Oklahoma." No viewers or engineers performed any function relating to boundaries.

After directors were appointed by the court Arbuckle was joined by the Bureau in negotiating reimbursement contracts between Arbuckle and United States; between Arbuckle, the United States and Oklahoma Water Conservation Storage Commission, herein the Commission; and between Arbuckle and participating municipalities and water users.

By action of governing bodies, each municipality except Ardmore submitted its respective contract to and received approval by the electorate. The electorate of Ardmore twice refused approval of the proposed reimbursement contract, the last time on February 4, 1964. In cooperation with Bureau Arbuckle revised and renegotiated a proposed contract with Commission. Under this contract Commission assumed the obligation and agreed to reimburse the

government for that portion of costs not contracted for by Davis, Sulphur and Wynnewood. These contracts were executed March 19, 1964, and the following day (20th) Ardmore filed motion to withdraw from Arbuckle without notice or appearance by any party.

March 23rd Arbuckle sought confirmation of reimbursement contract with United States, without mention of Ardmore's withdrawal. On March 24th the matter was set for hearing on April 14th after publication notice. This same day the court signed an order allowing Ardmore to withdraw from the District and be held harmless from further responsibility. On April 28th the court confirmed acceptance of resignation of Ardmore's members of Arbuckle's directorate. Ardmore subsequently demanded and received rebate of funds advanced for feasibility study.

The executed contracts mentioned obligated Arbuckle for $7,102,000 total reimbursable costs of the Arbuckle project. Of this obligation over 4 million in costs was underwritten by Commission's contract with United States; $774,400.00 by Arbuckle's contract with Wynnewood, $300,-700.00 with Sulphur and $745,700.00 with Davis; a contract with an individual user at a fixed monthly rate ($5,100.00) plus agreed price for gallonage above 1.5 million gallons monthly. Although somewhat amended, these contracts as negotiated originally formed basis for approval of the Arbuckle project.

Following completion, Arbuckle supplied water to participating municipalities and a private user, much of this by aqueduct which was part of the project. Under contract the first reimbursement installment was due in October 1969. Early in 1967 Lawton city officials evinced interest and discussed means for acquiring 11 million gallons of water daily. Being advised an election pledging water revenues and support of a contract by ad valorem tax levy would be required, an election was held and the proposal approved by Lawton's electorate.

In February 1968, Ardmore resumed activities by appointing a study committee and turning to the Bureau for aid. Arbuckle knew of Ardmore's interest, although no formal application had been filed. However, Arbuckle's board made it clear no contract with Ardmore would be considered until after determination whether a contract with Lawton would be consummated.

The evidence uncontrovertibly showed the proposed contracts between the municipalities and Lawton would have allowed the towns to realize substantial profit ($1,-400,000.00) over life of the contract. Additionally, sale of surplus water to Lawton would have accrued amounts sufficient to retire their contractual obligations to Arbuckle. Payments to Sulphur would have been sufficient to discharge obligation before Arbuckle delivered any water either to Sulphur or Lawton.

Evidence also shows a supplemental contract was approved April 9, 1968, whereby the Commission voted to assign additional 3294 acre feet of annual yield to Arbuckle. At this meeting a Commission member reported meeting with Ardmore's water committee, and advising the committee Arbuckle already had agreed to give Lawton all uncommitted water. At a meeting July 9th a second supplemental contract was discussed, under which all the Commission's remaining water supply, storage rights and obligations were to be assigned to Arbuckle, predicated upon successful negotiations for sale to Lawton. The Commission noted lack of request by Arbuckle for execution of supplemental contract. Commission also noted filing of action to restrain sale of water outside district or to Lawton, and concluded to defer consideration until receipt of Arbuckle's formal request or signed copy of supplemental contract.

At a meeting August 14, 1968, Ardmore's representatives informed Arbuckle's board of desire to contract for water. Pursuant to Arbuckle's request, Ardmore passed a resolution calling an election to vote upon a contract. On August 20, 1968, this reso-

lution was forwarded to Arbuckle. This same day Ardmore wrote the Commission calling attention to contract provisions which accorded preference to Arbuckle and participating municipalities in purchase of water storage rights and associated yield acquired by Commission. After directing attention to the contract, and supplement under which part of these rights had been transferred to Arbuckle, this letter stated:

"The City of Ardmore, Oklahoma, a participating municipality in the Arbuckle project, hereby makes application, subject to proper approvals, for the assignment to it of all the remaining water supply storage rights and associated yield acquired by the Commission under the terms of the Commission contract. The City of Ardmore stands ready to negotiate an acceptable contract at your convenience."

August 26, 1968, the Executive Director of Oklahoma Water Resources Board acknowledged this request, and required Ardmore to furnish copies of the resolution seeking assignment of water rights. This letter also stated it would be necessary for the Commission to study Ardmore's application, but that body would not meet until September 10, 1968. This is of interest, since at that meeting the Commission entertained Lawton's request for approval of a contract containing substantially the same provisions as the proposed contract with Ardmore, based upon a resolution adopted by Trustees of Lawton Water Authority. Despite knowledge of litigation pending against Arbuckle, and of Ardmore's pending application based upon claim of right as a conservancy district member, the Commission executed a contract with Lawton subject to attorney general's approval. September 12, 1968, the attorney general advised this contract was null and void, and pointed out possible alternatives involved in holding another meeting. Commission then called a special meeting for September 23rd. Interestingly enough, this was the day prior to Ardmore's scheduled election, at which the citizens overwhelmingly approved execution of a water contract with Arbuckle.

At an earlier meeting of Arbuckle (September 11, 1968) representatives of City of Davis had expresesd desire to acquire additional (4.5 million gallons) daily water rights. On September 18, 1968, the Commission advised Arbuckle and participating members of Lawton's application, and required participants to exercise options to purchase remaining storage rights, under Commission's contract with Arbuckle, before 10:30 A.M. September 23, 1968. Since Arbuckle could not act because of temporary restraining order, which had issued upon petition of interested persons to enjoin negotiation for out of district sale of water, no action was taken. Thus it will not be necessary to consider nature or extent of Commission's assumed authority to require Arbuckle members to exercise purchase options at Commission's direction and discretion.

Responding to that ultimatum Davis wrote Commission decrying attempt to contract away surplus water, and denying Arbuckle's authority to sell water outside the district. Attention also was directed to fact Arbuckle's action was contrary to, and in derogation of, Davis' earlier request for additional water rights. And, since Arbuckle's ultimatum precluded making intelligent decision, reasonable time was requested for study of the matter, during which no action should be taken upon Lawton's proposed contract.

At trial Davis, joined by Southern Oklahoma Development Association and Ardmore, moved approval of all contracts for water executed by Arbuckle prior to June 18, 1968. The motion was sustained and the court approved such contracts. The parties stipulated, except for letters dated September 18, 1968, there was no notice by the Commission of intention to exercise right of reassignment of remaining water rights to Lawton. Further, Ardmore received no notice despite a pending application, based upon formal resolution, request-

ing assignment of all remaining water rights on file with Commission.

The matters summarized are reflected by pleadings, evidence and a multitude of exhibits relating to the transactions mentioned. Trial, continued after commenced originally, was concluded March 3, 1969, and judgment entered April 1, 1969. Briefly, the court held attempted withdrawal from Arbuckle ineffective and that Ardmore was part of the conservancy district; Arbuckle's first duty was to satisfy the district's water needs which had not been done; if water could be sold outside Arbuckle this could not be done until all needs within district had been satisfied as this was purpose for which formed. For these reasons issues were found in petitioners' favor. Contracts of the municipalities depended upon contract between Arbuckle and Lawton, hence could not make independent contracts with Lawton; Commission was required to offer water back to Arbuckle, who could not waive right until needs of district had been supplied. Findings of fact ordered prepared in accordance with judgment were filed July 15, 1969. The foregoing recitation reflects the facts found by the court.

Conclusions of law pertinent to dispositive issues are summarized below. (1) Decree entered April 24, 1962, establishing Arbuckle and fixing boundaries became final, and was not subject to collateral attack by motion; thus purported order allowing withdrawal was void and Ardmore remained part of Arbuckle. (2) Waters forming lake were withdrawn from appropriation for purpose of Arbuckle project and subject to use by Arbuckle only under 82 O.S.1961, § 91. (3) All water unneeded by Arbuckle became part of public domain subject to appropriation by others only under statutory procedure, and was not disposable otherwise by Arbuckle. (4) Commission holds rights under contract between United States, Arbuckle and Commission. Under contract Commission first must offer reassignment of rights to Arbuckle and district members before sale to others, and Commission did not lawfully comply with this requirement. (5) Ardmore's failure to approve proposed contract with Arbuckle did not defeat claim to water rights when and if a proper contract made for cost repayment, and trial court has continuing jurisdiction over all contracts. (6) Assuming authority to contract for disposal of excess water, Arbuckle's first duty requires provision be made for district's needs, which was not done. (7) Proposed contract between Arbuckle and Lawton was beyond lawful authority, and hence permanently enjoined. (8) Proposed contracts between Lawton and district municipalities depended upon execution of contract between Arbuckle and Lawton, and because already enjoined it became unnecessary to consider municipalities' rights and injunction as to them was dissolved. (9) The Commission admits contract requires giving Arbuckle and municipalities preference to water rights held by Commission, and Arbuckle may not waive this right until district needs have been supplied. Upon proper showing Arbuckle has waived reassignment then injunction against Commission would be dissolved.

This appeal involves correctness of trial court's conclusion of law and judgment. As plaintiff in error, Arbuckle's appeal presents two propositions which urge trial court error in: (1) holding Ardmore a member of Arbuckle; (2) finding Arbuckle precluded from selling water outside the district. These propositions are so closely related as to be practically inseparable. In support of the first contention nine points are discussed, most of which need not be considered separately. Specifically, we decline to consider whether Ardmore's motion to withdraw from Arbuckle was void, as an attempt to collaterally attack a final judgment. Likewise, at this time we purposely avoid discussion of conclusion of law No. 6 that water not needed by Arbuckle becomes part of the public domain, subject to appropriation only under statutory procedure, and may not be disposed of by Arbuckle.

Our conclusion obviates need for consideration of questions provoked by transactions which occurred prior to August 26, 1968. On that date Commission acknowledged Ardmore's request for assignment of all remaining water supply storage rights. Prior to that date negotiations which were being carried on with Lawton culminated in Commission's attempted execution of a contract with Lawton on September 10, 1968. Thereafter, September 12, 1968, the attorney general advised Commission this purported contract was null and void, having been adopted in violation of 82 O.S. Supp.1967 § 1353.

From this record the following matters are uncontroverted: (1) the Commission held uncommitted water supply storage rights; (2) under original contract between United States and Commission Arbuckle had prior right to purchase all remaining storage rights; (3) both the Commission and Arbuckle knew Ardmore's request for water was pending; (4) there was no outstanding, valid contract for the uncommitted water, when the temporary restraining order was entered. These uncontroverted facts, in essence, simply present the question as to which municipality is entitled to the water held by Arbuckle and Commission?

■ When Arbuckle was being formed Ardmore was an integral part of the district. Recourse to statutes governing conservancy districts, 82 O.S.1961, § 531 et seq., discloses no requirement that a municipality, or an industrial user, must be an original participant or be barred from later participation in the district. Should this requirement be assumed then clearly Lawton would have no standing in attempting to contract with Arbuckle or the Commission. The original contract with United States obligated Arbuckle to reimburse the United States for that part of construction costs allocated for municipal and industrial water supply. Contemporaneously, the Commission contracted to repay a fixed balance of construction costs, in return for allocation of all remaining storage capacity and proportionate share of annual yield. The contract set out Commission's repayment schedule and provided " * * * the District and its participating municipalities the first opportunity to purchase storage rights and associated yield."

■ Nothing contained in the statutes, supra, or in contracts between the parties, placed any burden or obligation upon a participating municipality until execution of a water purchase and repayment contract. When this occurred a contracting municipality assumed a financial obligation to discharge the amount allocated for repayment of project costs, and pro rata portion of maintenance and operation expense. There was no valid contract allocating uncommitted water when this action was filed to restrain Arbuckle from contracting out of district sale, and to prohibit the Commission from attempted assignment of uncommitted water rights to Lawton.

Error is urged as to the conclusion that Arbuckle could not sell water outside the district. Briefly, it is argued our statutes, 82 O.S.1961, § 541 et seq., provide for creation of conservancy districts and execution of contracts, and authorize the conservancy board to negotiate contracts with any Federal or State agency *or any other public entity*. Both Arbuckle and the Commission are extended statutory authority to sell water storage facilities to any municipality, restricted only by prohibition against sale of water for use outside the state.

■ Arbuckle concludes the contract with United States was subject only to restrictions specifically imposed by Oklahoma statutes, hence rights were fixed upon confirmation (April 21, 1964) of contract—and nothing in contract or statutes restricts or prohibits contract proposed and negotiated with Lawton. From this posture Arbuckle concludes *powers and restrictions* not enumerated cannot be read into the statute, and the court erred in holding Arbuckle precluded from selling water outside the district. Essence of this argument is reliance upon the maxim "expressio unius est exclusio alterius", that mention of

one thing in a statute implies exclusion of another. This often has been denominated an auxiliary rule of statutory construction and not a rule of substantive law, and never should be applied to defeat apparent legislative intent. Myers v. Oklahoma Tax Comm. Okl., 303 P.2d 443.

■ This entire argument is unpersuasive for reasons hereafter noted. The first appears in the provision of contract between United States and the Commission dealing with project financing, which states:

> "In consideration of the obligations assumed by District, the Commission shall give the District and its participating municipalities the first opportunity to purchase water supply storage rights and associated yield acquired by the Commission under the terms of this contract."

No clearer language could be found by which to dictate an absolute requirement for all uncommitted water to be offered participating municipalities within the district. Admittedly there was no effort toward compliance with this contract requirement. As petitioners point out, until both Arbuckle and the participating municipalities waive any claim or right to reassignment of water rights the Commission cannot act, but must hold the rights intact for demands of local users.

The second reason results from legislative expression involved. Partially because of language of the statutes, and particularly in view of provisions creating the Commission, it is our opinion the Legislature clearly intended to create a method or means by which water and/or storage rights in a project might be preserved for local municipalities, industries or users. Statutes creating and controlling that agency authorize the Commission to sell, transfer or lease storage facilities to " * * * any municipality, industry, or other local interest * * * " at actual cost. Bouvier (4th Ed.) 1086 gives this definition: "Local relates to place, expressive of place; belonging or confined to a particular place."

Also see Green v. City of Mt. Pleasant, 256 Iowa 1184, 131 N.W.2d 5; Zilesch v. Polk County, 107 Or. 659, 215 P. 578.

■ The statutes refer to municipality *or other local interest.* This language cannot reasonably be construed to include municipalities or local interests other than those within boundaries or confines of Arbuckle. To construe the quoted language in any other manner would allow Arbuckle, or the Commission, to dispose of water and water storage rights without regard to needs and demands of local interests. This conclusion finds support in language of § 1355, supra, relating to project costs. There, in making provision for reimbursement of construction costs, the statute provides water storage which cannot reasonably be used within present or estimated "future firm demands of local users * * * ", may be contracted by the Commission to defray added costs. This language can only mean all local demands must be fulfilled before other contracts to defray costs can be considered.

The judgment which established Arbuckle Master Conservancy District included Ardmore within confines or area of the district. Inclusion within area of Arbuckle, even though originally not a participating municipality, would categorize Ardmore as a local user, or among other local interests specified in the statute. Being clothed with a local interest Ardmore would become a participating municipality upon execution of a contract with Arbuckle. Request for water and firm offer to execute such contract was on file prior to Commission's attempted execution of the Lawton contract. A mandatory requirement was for the Commission to give Arbuckle and participating municipalities priority in purchase of water rights from the project, initiated and designed as a local project for benefit of the specific area involved. As argued by petitioners, a properly initiated appropriative water claim is governed by the law existing at the time. Okl. Water Resources Board v. Central Oklahoma Master Conservancy District, Okl., 464 P.2d 748.

■ The Arbuckle project was developed as a local project. The waters appropriated as basis for eventual development were withdrawn specifically for use of the conservation district, which included municipalities and local users. Arbuckle and the Commission held uncommitted water and/or water storage. When and under what circumstances that water might be disposed of outside Arbuckle is not considered, but only that without a binding contract for uncommitted water rights preference right of local users must be recognized. What is determined at this time is Ardmore's entitlement to priority in allocation of water rights as a local user, and Arbuckle's obligation to contract first with Ardmore to provide for needs within the district. Until compliance with statutory requirements, by offering to reassign water storage rights to Arbuckle, the Commission lacks authority or standing to contract with any other entity. The trial court was correct in so concluding as a matter of law. We are of the opinion the trial court's determination of decisive issues was correct and injunction ordered was proper.

Judgment affirmed.

DAVISON, WILLIAMS, BLACK-BIRD, HODGES, LAVENDER and Mc-INERNEY, JJ., concur.

IRWIN, C. J., and JACKSON, J., dissent.

JACKSON, Justice (dissenting).

In 1963 the Legislature of this State declared that it is the public policy of the State of Oklahoma to encourage and promote the optimum development and utilization of all feasible reservoir sites for the storage of the waters of this State for the benefit of the public. 82 O.S.Supp.1963, Sec. 1351.

In the same Act the Legislature created the Water Conservation and Storage Commission and authorized it, where necessary to promote the optimum development and utilization of reservoir sites, to acquire interests in land. The Commission is an in-strumentality of the state, and the exercise of its powers is an essential governmental function of the state. 82 O.S.Supp.1963, Sec. 1352.

When a proposal is made by a governmental agency to construct a reservoir in this state it is the duty of the Water Conservation and Storage Commission to study the proposal. If the Commission concludes there are surplus waters in excess of the present and future needs of water users of the contributing watershed available at the proposed reservoir site for the full and optimum development of the reservoir it is the duty of the Commission to request the Federal and State agencies to design the reservoir to accommodate or include the surplus waters. 82 O.S.Supp.1963, Sec. 1354.

In the instant case it was contemplated during the planning stages that the City of Ardmore would become a participating municipality in the project and would contract for all of the storage not required by other contracting municipalities and water users in the District. However, on February 4, 1964, the people of Ardmore, by their vote, rejected for the second time the opportunity to become a participating municipality. Ardmore was released from its prior commitments by the Department of the Interior on March 11, 1964, and with the approval of the District Court on April 14, 1964. By reason of the refusal of Ardmore to financially obligate itself by contract for the surplus water it became the statutory duty of the Water Conservation and Storage Commission to enter into a contract with the Federal government to receive the surplus storage and to negotiate with municipalities or other local interests *"of the State"* to receive the surplus waters to be impounded within the reservoir. 82 O.S. Sup.1963, Sec. 1355, provides in pertinent part:

"Whenever any project or plan for the construction * * * of any dam, reservoir or other structure includes within its design and specifications provisions for the development of water supplies for

domestic, municipal, agricultural, industrial and other purposes *the Commission is hereby directed to negotiate with the municipalities* or other local interests of this State and its agencies and the Federal government * * * for the purpose of determining the cost of reimbursing the Federal government for the allocated cost of including such municipal, agricultural and industrial water storage within such construction. Any available storage for such purposes which cannot reasonably be used within the present or estimated future firm demands of local users may be contracted for by the Commission in order to assure the Federal government that such added cost will be provided as authorized by Federal law, and that necessary funds for any charges shall be paid by the Commission to the Federal government pursuant to such contract and applicable Federal law after examination and determination by the Oklahoma Water Resources Board that such charges are in harmony with existing Federal law and policy at the time that the projects are built and the contracts between the Commission and the Federal government are executed. * * *." (Emphasis supplied.)

The Commission entered into a contract with the Federal government on March 19, 1964, to receive Ardmore's share of the storage facility rendered "surplus" because of Ardmore's refusal to enter into a "firm demand" for its allocated share of the facility. Under the statute the Commission did what it was directed to do; that is, acquire the surplus waters to be impounded in the reservoir. The facility could not have been constructed for "optimum development" without the financial assistance of the Commission.

Question: How long must the Commission wait on "local firm demands" before it may negotiate with municipalities farther removed from the reservoir? In this case approximately three years elapsed before the Commission entered into meaningful negotiations to dispose of the surplus water. In the meantime the reservoir was constructed and water was being supplied to those municipalities who had entered into firm financial commitments. The first installment under the contract with the Federal government was due to be paid in October 1969.

Under the contract between the Commission and the Federal government entered into on March 19, 1964, it was the duty of the Commission to give "participating municipalities" and the District the first opportunity to purchase water supply storage rights. The Town of Davis may have been deprived of that privilege. But undoubtedly this provision was not intended to include Ardmore, for Ardmore was specifically released from its participation in the reservoir project by the Secretary of the Interior on March 11, 1964.

If the Water Conservation and Storage Commission is unable to enter into *firm* negotiations with municipalities in Oklahoma outside the described boundaries of the district for the sale of its surplus reservoir facilities, then it is apparent that the Commission's ability to dispose of its surplus water facilities will be severely impaired. It is expensive for a prospective municipal customer to make surveys and conduct municipal elections. Such a municipality will not eagerly enter into negotiations for the Commission's surplus water facilities unless it can believe that the Commission can follow through with a contract. I believe the trial court's decision is in conflict with the Commission's statutory powers and should be reversed. I would dissolve the injunction against the Water Conservation and Storage Commission and authorize the Commission to proceed with its contract, after first giving the "participating municipalities" an opportunity to claim a greater share of the surplus water.

I am authorized to say that Irwin, C. J., concurs in the views herein expressed.